Fire and Casualty Company. Oral argument not to exceed 15 minutes to 5. Mr. Parker, please be adjourned. Good morning, Your Honor. May it please the Court. Mr. Harrison, good morning. Your Honor, I'd like to reserve half of my time for rebuttal. Seven and a half minutes. Your Honors, I don't want to waste your time. I know you don't have a lot of time this morning. This appeal comes down to one central... We have as much as we've allotted for argument. Well, I want to make sure I keep it simple. It really boils down to one big argument, and it's this. If we take all inferences in favor of Mr. Rose, who's the non-moving party on this issue, is there evidence in this case that would support a reasonable jury finding that Mr. Rose did not intend to misrepresent or conceal information about judgments against him or tax liens against him when he was answering questions at his recorded statement in January of 2009? That's what this boils down to. Now, if you agree with me that there is sufficient evidence to support such a jury finding, then it's clear that the district court erred, and that requires a reversal, and we go back and we deal with it on the merits. You know, the district court, it drew an inference of intent from the circumstances that surrounded these answers that Mr. Rose gave at his recorded statement. And is that really the only conclusion that could reasonably be drawn from these circumstances? And the answer is no. The other very reasonable conclusion is that Mr. Rose had a complicated business life, which I'll describe for you in a few minutes here, and given those specific answers at that specific moment in time was not easy for him because these are complicated questions for a man who owns several businesses. So here's our situation. In his recorded statement in January of 2009, Mr. Rose said up front in this two-hour interview, it was a two-hour recorded interview, he said up front that he owned several businesses. At some point in the interview, I believe about three-quarters of the way through, he was asked, have you been involved in many lawsuits? And he answered enthusiastically yes. In fact, he was a little sarcastic about it. He said, you've not been self-employed before, have you? Because the answer was clearly yes. Mr. Rose and the companies that he had ownership interest in were involved in lots of litigation. And he made that clear in that recorded statement. Did he give the name of his lawyer to the adjuster at that time? I believe he did, Your Honor. And particularly the lawyer who was involved with Mr. Rose and his companies in a dispute with Fifth Third Bank. Now you'll recall if you've taken a look at the recorded statement that Mr. Rose was asked about judgments against him, and I'll say against him, not just against his companies but against him, and he said, yes, Fifth Third Bank has over $4 million judgment against me. And he said, yes, you can go talk to my lawyer about that. That was the biggest judgment or case against him, or was there something bigger than that? That was the big one, Your Honor. And when we say against him, I know that Mr. Harrison makes a point in his appellee brief that he believes Mr. Rose misrepresented the nature of that lawsuit because when asked about the lawsuit, Mr. Rose said that it was involving one of his companies instead of involving him personally. Well, the truth is really that it involved both his companies and him personally. When you take a look at the judgment, it's against the companies, but it's also against Mr. Rose as a guarantor of the companies. If you know people who are in business, you can't start a business these days without giving personal guarantees on the debt, and that was true for Mr. Rose and his companies. Any suits from any other counties other than Galea County, and he says no, and any other states, no. That's the specific thing they're claiming was a misrepresentation. That is, Your Honor. And the question is this. We use the word misrepresentation, I think, in the case law in Ohio a bit too broadly because was that answer factually correct? Was it a factually complete answer? No, it wasn't. But does that necessarily mean that he had the intent to misrepresent or conceal when he gave that factually insufficient answer? And the answer is no. At least not as a matter of law, because that's what the district court held, was that as a matter of law, he had the intent to misrepresent or conceal when he gave that factually insufficient answer, which, by the way, he factually sufficiently answered later, but not at this moment in time. What did he do later? Well, Your Honor, this is a point of some contention between us and Mr. Harrison, but in the examination under oath, there was also a sort of catch-all question asked of Mr. Rose, any other judgments. I mean, after having asked him lots of questions about specific lawsuits and specific liens, he was asked any other judgments, and his answer was, possibly, I don't know, which was the most honest answer he could give. My point really is this. Mr. Rose had an ownership interest in several businesses, and those businesses were involved in lots of litigation, lots of fights over money. Mr. Rose had lawyers, and he freely referred State Farm to his lawyers. Later in the examination under oath, there were lots of questions about whether his businesses were technically profitable. Well, he referred State Farm to his accountants and said, please go talk to my accountants. You're welcome to talk to them, the same way he said you're welcome to talk to my lawyers. This was a businessman who had lots of irons in the fire, and so to draw the inference that if he gave an incorrect answer to the question of, do you have any other lawsuits, or do you have any other judgments, or any other tax liens, to draw the inference that he was necessarily intending to mislead or conceal when he gave an incorrect answer to that question is logically wrong. Particularly in this day and age, there is no such thing. In this interview, he had already given his social security number, the names of these companies that he owned parts of, lots of information about this $4 million-plus judgment against him. Could there have been any doubt in Mr. Rose's mind during the course of this two-hour interview that he was going to be investigated by State Farm? How in the world would anybody under those circumstances think, oh, I'm going to pull a fast one on State Farm. I'm not going to tell them about those judgments against me. That could not have been his intent. Nobody in this day and age can reasonably think that they're going to get away with that, and Mr. Rose didn't think that. He just didn't keep all these facts straight in his head. Later on, in the examination under oath, he had more information, and he gave better answers. How much longer was this investigation under oath that he made after the first initial interview? Well, the first interview was two hours long. I can't tell you how long the examination under oath was. It was several hundred pages. How much time elapsed? Oh, I see, Your Honor. The recorded statement, my time is up, I don't answer that question. The recorded statement was in January of 2009, two weeks, less than two weeks after the fire. The examination under oath was August of 2009, so about seven months later. My time is up. Thank you. Good morning, Your Honors. May it please the Court, Greg Harris on behalf of the aptly, in this case, State Farm Fire and Casualty. Good morning, Mr. Parker. This case is really about enforcing a fundamental principle in a property insurance policy, which is that a policyholder must be truthful and honest during a claim investigation and not intentionally mislead or conceal material facts that are requested by an insurance company during the investigation. The policy requires that from its insurers. It is absolutely crucial to the proper investigation of a fire, particularly a suspicious fire like the potential arson fire that was involved in this situation. And there's no question, in fact, Mr. Rose has admitted in his briefs, and again in argument, that there were incorrect information, factually false information that was provided to State Farm by Mr. Rose in this event. The question of intentionally, isn't that generally a jury question to decide whether it was intentionally made, if he told about some situations and some he didn't? Intention can be a jury question in some situations, Your Honor, that is correct, but there is Ohio case law in the insurance policy situations, both life and property and casualty, that says intention can be implied from the materiality of the information being requested and by the substance of the information that's being requested in this case. And what district courts have had to struggle with in that situation is what happens when a policyholder just says, well, I made a mistake, I just forgot. And what courts have said is you've got to do more than that. You've got to come up with some specific information upon which a reasonable jury could decide that in fact it was a mistake, that it was something that was just forgetfulness. Why wouldn't that other stuff that you have to come up with in this case be the fact that Mr. Rose was forthright about the Fifth Third judgment? There's also an answer he gave, I don't have any, you get stuff from vendors, that's kind of an ambiguous answer to a question that's sort of unclear by that point, and it certainly suggests that there may be other matters relating to judgments. And then finally the fact that he's not specifically asked about liens and also that the questioner does not return to, you know, could you itemize those matters for me. What about all those things that are found in this transcript of the recorded conversation? Well, in the transcript, Your Honor, and again I think to answer the first part of your question, you can see that there are a number of things that are not disclosed, which he again does not ever claim that he didn't know about. He just says, well, I decided not to determine at that point, or I tried to refer it to somebody else. It's undisputed that he was not specifically asked about liens at that point. He was asked about judgments, and of course those liens were filed as a... Now, a lien may come from a judgment, but, you know, they're two different things. Why would you expect that they would be covered? Well, again, Your Honor, this is a person with a sophisticated businessman who's been obviously by his own admission involved in litigation. He understands that these liens have been filed against him and they then have the force and effect of judgments at that point, and as you look at the number of those items that are out there, there are incredible numbers of them. Over 20 of them in Galli... You would say that from the evidence that was adduced as to what his true financial situation was, that a jury could only infer that he had deliberately concealed the information. That is correct, Your Honor, and that's what the judge found in this case. He found that that was implied by the facts of the case, by the number and quantity of the misrepresentations that were made by Mr. Rose in the situation. Again, he was specifically asked, is there anything outside of Gallia County? He said no. Is there anything out of the state of Ohio? He said no, and in fact, that was incorrect in this case. What is the total amount, dollar amount, of those judgments that weren't disclosed? Well, there are hundreds of thousands of dollars. They're not the seven figures, which was the fifth there, but they are hundreds of thousands of dollars. I thought it was more like 120,000. Well, I think it's over 300,000 if you look at the different numbers that are involved there, Your Honor. Well, if you take out the fifth, third judgment, how much is left? Is that what you're talking about? That's correct, Your Honor, that's correct. And again, let's go back to the fifth, third judgment. He said it was against the company when, in fact, it was against him personally. But later, didn't he say that he had a judgment against him in that case? That's what he said. Eight months later, he did, Your Honor. Yes, he did, and in his examination under oath. After he'd been discovered that we understood that there was this judgment out there. So then he became truthful about it. Even then, he said, well, but they've lost it every turn. They lost an appeal, which was not true at that time as well. What I think we need to focus on is for him to have come up with something that created a jury fact, a fact that could have gone to jury consideration. He needed to say something like we found in some other cases. I had some kind of mental issue or a mental injury or whatever. You were asking me these questions on the front yard of the house while the fire was still burning in the background, and I was emotionally distraught at that point as opposed to what happened here, which was two weeks later at a state farm agent's office. Certainly, the only thing that can be shown to create a fact question is not some claim that someone was emotionally distraught or under some kind of emotional strain. The law isn't limited to that, you don't mean to suggest. I'm not suggesting. I'm just trying to give you examples of something, Your Honor, that he could come up with which would at least get further than just saying is not. And that's what's important here, Judge, is that we need to get beyond the pleadings and just the plain denials to get to something that could create a factual issue in terms of deciding that we need to go to a jury as opposed to deciding on summary judgment. What's your strongest case that you think is analogous to your position? Well, I believe it's the Parker case, Your Honor, which is an Ohio State court which talked about the implication of finding that you can find intention from the misrepresentations that are made. Well, can find intention is not the same as you must find intention and therefore no reasonable finder of fact can conclude otherwise. No question, Your Honor, that is a different standard. But what they are saying is you cannot foreclose a court from determining based on the summary judgment record that intention is implied and there is no other reasonable jury determination that can be made. And that, in fact, is what the district court decided in the case and clarified that in the reconsideration opinion, that that was his finding based on, again, the extent and the nature of the misrepresentations that were made. Again, the issue is that Mr. Rose has never claimed that he didn't know about these judgments, that he didn't know about the liens. He doesn't contest that he failed to disclose them and he doesn't contest that the information was absolutely material to the investigation. And it's important, again, to distinguish with the fifth third issue why it's important that we understand whether something is personally a judgment against him as opposed to his business. Obviously, both are important in the overall financial picture that an insurance company needs to look to. But personal debts are even more important because it may well be that in that instance, Mr. Rose was not able to flush those down through a bankruptcy filing because they were personally against him. It could be that there's a, is it for some nature of something that's intentional conduct or misconduct that a bankruptcy discharge would not apply to. And again, it is more personally involved in terms of his situation that he's not able to use a corporate shield or some other defense to. And that's why the distinction in his misrepresentation about that judgment being only against his company and not him personally at the recorded statement was so important. Again, as to the judgments and liens, he just sort of directs, well, you know, Gallia County, there might be something. And again, he expressly was asked about other counties, other states that were out there, and he said no. There are no such things when in fact we found that there were a number of them and there were those judgments against him in those other counties, other states. He doesn't explain why he failed to disclose those. He doesn't provide any kind of explanation of that. And those things were, again, material to the investigation to understand that this aren't just financial problems that were limited just to his county, but in fact are multi-state issues, multi-county issues that involved judgments against him personally. Important for State Farm to understand in terms of assessing his financial situation. Again, important in terms of Mr. Rose's protestations that he didn't have financial problems, because even though he had a lot of debts and he had a lot of issues, he could still make payments when they came due. So that State Farm needed to determine, well, what's out there in terms of these liens and judgments? Are there payment plans? If they even have been settled or dismissed, is there some arrangement to make installments that we need to understand in determining what his overall financial picture is? And by failing to disclose those, in fact denying those, he frustrated the investigation, as has been proved by State Farm in the summary judgment proceedings. I also wanted to turn to the bad faith claim. Mr. Rose made a bad faith claim. The court below granted summary judgment as to it, and there was no briefing of it by Mr. Rose here at the Court of Appeals, and we pointed that out. Well, that really rides along with the other, because if he loses on your claim that it's fraudulent, you can't have a bad faith claim at all, right? I agree, Your Honor. It does ride on that. But his argument is, well, if you reverse on the breach of contract claim, then the bad faith claim goes down as well, and that is not the case. There is obviously a separate legal standard for a bad faith claim. A plaintiff has to show that State Farm had no reasonable justification for its decision. It's a much higher standard. But isn't his position is really that if the district court is reversed on the breach of contract claim and it goes back to the district court, that of necessity the district court will have to then consider the bad faith claim because the whole rationale for the district court's decision on the bad faith claim was its ruling on the breach of contract claim. Your Honor, that is his position, and it's incorrect. Well, it might be, but I don't think that's his position, not what you originally stated. Well, I guess what I was trying to say is what his position is, is the bad faith claim rides with the breach of contract, either rises or falls, and that's not the case because there is a separate standard. And, in fact, the district court, even though it said that because I founded the breach of contract. Well, ultimately, the elements of the two are different. That is correct. He is correct in that the correctness of the court's summary, the district court's summary judgment claim will also determine the correctness of its ruling at this point on the bad faith claim. No, Your Honor, that is not correct. Well, if we reverse, then the district court is wrong on the bad faith claim, too. No, Your Honor, that is not correct, and here's why. Because Ohio says there's a different standard there, and the court went on to say that even if this were not something where I granted summary judgment, I find that because there are factual issues regarding the arson defense, there is sufficient justification for State Farm's decision, notwithstanding whether I'm right or wrong on that. That might be. And that is the case, Your Honor, yes. That might be. And that's why I wanted to urge this court why, even if there is any issue regarding the breach of contract claim, the judge's decision on the bad faith claim should also be affirmed. Because he found, properly so, that State Farm, at the very least, had reasonable justification for its decision. He found it a matter of law, so he's saying there's no jury issue on the bad faith claim. Well, he went on to say, in a sentence in the determination about bad faith, that because there were factual issues regarding the arson defense that supported State Farm's decision, that as a matter of law, then therefore there was reasonable justification on the bad faith claim. Right, but I think it may be that the judge is going to, if we reversed on the underlying plaintiff's claim, that the judge may need to reconsider the bad faith. Well, and Your Honor, again, I want to push back. There is the sentence that you mentioned, but it does not, I mean, there's also this language, because plaintiff's claim for loss is not covered under the policy, defendant did not act in bad faith, it appears the reason for denying the claim that the district court gives is its ruling on the breach of contract claim, and then the sentence you rely on could or could not be considered a throwaway sentence. Well, again, because he's talking about a different issue, which is the arson versus the misrepresentation issue, I think it's clear that he did find both reasons supported his decision. In fact, all those arguments were briefed at the district court, and again, the initial position is they have not... But, you know, it would be more natural to have said, but even if that were not a sufficient basis for denying the claim, the court also finds that the factual dispute about arson precludes recovery against the insurer. I agree, Your Honor. It could have been explained better, but I just wanted to point out that I believe that the judge did decide that, and those issues were before the court and argued, and there's a separate basis for affirming the bad faith claim. I know my time is short. I just wanted to wrap up again to say that it's important here, again, that an insurance company be able to rely on the truthfulness, the completeness, the honesty of its insurance answer and its investigation. A fire investigation is not a catch-me-if-you-can type investigation. We need to be able to rely from the get-go on the honesty of the insurers and the information they provide. Again, to reinforce this requirement, the policy allows us to void the policy if there has been a misrepresentation or concealment. The court properly found there was in the court below, and we ask this court to affirm the district court's grant of summary judgment to St. Farm on these issues. Thank you, Your Honors. Your Honors, a few points. On the last substantive point that you were just discussing with Mr. Harrison, the question of the bad faith claim, the section of the judge's order that addresses the bad faith claim only focuses on the fact that the judge had just granted summary judgment on the coverage claim and said because there's no coverage, I find there can't be a bad faith claim. So, really, that is the reason why the judge did what happened. So, really, if you reverse on this summary judgment issue, we're already content. I believe it is appropriate for the case to go back in its entirety and for the district court to address bad faith. If the district court wants to say that because there is an arguable question that there can't be a bad faith claim, we'll deal with that at the district court level, but that's not what the district court did that made us appeal the district court. We're appealing the district court as to the very specific issue that we've already talked about, that the district court granted summary judgment on the coverage question and then got rid of the bad faith claim because of that judgment. Now, a few of the things that Mr. Harrison touched on. He said that under the case law that he's given to you, intention can be implied or, I guess, inferred by the court from the circumstances. Well, it's interesting when you take a look at those cases, what the facts are that lead courts to do that. Pretty much all the cases are either cases where the insured admits that they lied, there were several cases cited by State Farm that had that set of facts, or Mr. Harrison's strongest case he gave you, the Parker case. This is a great one. The insured said in his recorded statement, I don't gamble. And then later said, I make a living as a gambler. Now, that is a circumstance where I believe the district court had the ability to draw what it felt was the only reasonable inference, that the insured was not being honest. When the guy says, I don't ever gamble, and then turns around and says, I make a living from gambling, yeah, I can see that being a pretty good case for finding intent to misrepresent or conceal as a matter of law. What's the best case on your behalf? Since they've mentioned Parker, let's hear about your case. Your Honor, I believe that it would be best to take a look at the Pepper v. Hartford case, really because it focuses on the very specific issue, which is when you're talking about intent to misrepresent or conceal, that is normally a jury issue. And you're going to have to have a pretty special set of factual circumstances to take that question away from the jury. And look, in fairness to Mr. Harrison, he has cited some cases that have those special facts. Plenty of cases where the insured, you know, they've realized that they've been caught telling a lie and so they fess up. Well, that's not our situation here. Mr. Rose wasn't lying. He just got it wrong. It's a complicated set of facts for him. He hires lawyers and accountants to help him keep track of all that stuff, and he just got it wrong on the specific day when he was given a two-hour interview, less than two weeks after his house burned down. How much do you say these other judgments accumulate, the ones that were out? You had the number right, Judge Gilman. We believe it's about 120. You know, here's the problem. And I'm glad you asked that. This list of judgments that State Farm has offered up, it is a mess. And I don't say that lightly. You know, in this list of judgments that they want to use, first of all, there are seven traffic cases. Now, how is that relevant? Traffic cases you don't meant? Speeding tickets. Yes, Your Honor. Speeding tickets against Mr. Rose. How in the world that has anything to do with the fact that he had incentives to torch his house, I will never understand. Maybe speeders light up more. Speeders are more likely to set fire to their own house. Right. I guess so. A bunch of them were dismissed. Some of them Mr. Rose would have had to have a time machine to know about them because these judgments arose after he gave both his recorded statement in January of 2009 and his examination under oath in August of 2009. Many, and this is an important issue, many of them were tax liens against just the companies that he has an ownership interest in. You know, that's an issue that we didn't, frankly, we didn't develop enough in our briefing. You know, Mr. Harrison makes a huge point about, oh, Mr. Rose misrepresented the nature of that fifth third lawsuit because he says the judgment was against the company. Well, I have to respectfully disagree with Mr. Harrison's recitation of the facts. Please take a hard look at that recorded statement. The questions first were asked about lawsuits and then later the questions were asked about judgments. So when it came to lawsuits, the question was asked are those individual lawsuits and Mr. Rose said, no, it involves my company. And you'll see this. It's all right on two pages of the thing. And then when asked, okay, are there any judgments against you? So right after the question about these companies, he was asked, any judgments against you? And Mr. Rose said, yeah, in the fifth third case, I have more than $4 million against me. So. Is this in his initial interview or the one later? No, the initial one, Your Honor. This is the two-hour January 2009 recorded statement. Yeah, it's all in there. It's right on two pages. You'll find it. Well, your opponent says he did mention that the first time. Is that wrong? Well, you know what, Your Honor? Then Mr. Harrison's wrong because it's right there. The interesting thing about the examination under oath, you know, Mr. Harrison says that Mr. Rose didn't dispute, that he didn't disclose. Well, you know, it's interesting. Mr. Rose gave a reported statement, then he gave an examination under oath, and then he gave a deposition. You know, it's not called a come give a speech under oath. It's called an examination under oath. They need to ask him the questions. You will look high and low through that examination under oath that's in the record, and you're not going to find questions about judgments. At least not the catch-all, do you have any other judgments against you? We wanted to put it in the record. The juristic court wouldn't let us, and the answer was, I don't know. One last thing I'd like to say. You know, Mr. Harrison says that these questions are crucial to the investigation. I say that in 2014, that's just not true anymore. Once Mr. Rose gave these folks his social security number, If I may finish up, my red light's on. Well, very quickly. I will. 2014, once I give somebody my social security number, and I know I'm being investigated, the idea that they need to ask me how many judgments I have against me, that's just not true. What they need to do is go find it for themselves. That's the most accurate information they're going to find. I'm not sure how pertinent that is, but on that note, we'll say to both of you, we appreciate the argument that both of you have given, and we will consider the case carefully.